

# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

May 6, 1996

The Honorable Fred Hill
Chair
Committee on Urban Affairs
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910

Opinion No. DM-390

Re: Whether a city that terminates a reinvestment zone pursuant to section 311.017(a) of the Tax Code may create a new reinvestment zone with identical geographic boundaries for the purpose of setting a new tax increment base, and related questions   (RQ-703)

Dear Representative Hill:

You ask whether a city that terminates a reinvestment zone pursuant to section 311.017(a) of the Tax Code may create a new reinvestment zone with identical geographic boundaries for the purpose of setting a new tax increment base. Chapter 311 of the Tax Code, the Tax Increment Financing Act (the "act"), authorizes the governing body of a municipality to designate a contiguous geographic area in the jurisdiction of the municipality as a reinvestment zone to promote development if the area meets certain criteria. *See* Tax Code §§ 311.003, .005. Section 311.008 of the act authorizes a municipality to "exercise any power necessary and convenient to carry out this chapter." *See also* Tex. Const. art. VIII, § 1-g (providing that the legislature may authorize various political subdivisions to grant relief from ad valorem taxation on property located in a reinvestment zone and to issue bonds or notes to finance the development of reinvestment zones). A reinvestment zone terminates on the earlier of the termination date designated by the ordinance creating the zone or the date on which all project costs, tax increment bonds, and interest on those bonds have been paid in full. Tax Code § 311.017(a)(1), (2). An earlier termination date may be designated by an ordinance adopted subsequent to the ordinance creating the zone. *Id.* § 311.017(a)(1).

Section 311.012 defines the crucial terms "tax increment," "captured appraised value," and "tax increment base" as follows:

> (a) The amount of a taxing unit's tax increment for a year is the amount of property taxes levied by the unit for that year on the captured appraised value of real property taxable by the unit and located in a reinvestment zone.

> (b) The captured appraised value of real property taxable by a taxing unit for a year is the total appraised value of the property for that year less the tax increment base of the unit.

> (c) The tax increment base of a taxing unit is the total appraised value of all real property taxable by the unit and located in a reinvestment zone for the year in which the zone was designated under this chapter.

Section 311.013 provides that each taxing unit that taxes real property located in a reinvestment zone shall pay into the tax increment fund for the zone an amount equal to the tax increment produced by the unit less certain specified deductions.[1]

By way of background, you explain that the City of Dallas (the "city") passed an ordinance designating a reinvestment zone in December 1988, to take effect on January 1, 1989, and to terminate on December 31, 2008. The tax increment base of the reinvestment zone--the total appraised value of all taxable property in the reinvestment zone for the year in which the reinvestment zone was designated, that is, 1988--was $48,299,020.00.

In 1990, the city made a bridge loan to the reinvestment zone in the amount of $2,100,000.00, anticipating that the tax revenues on the captured appraised value of the real property in the reinvestment zone would enable the reinvestment zone to repay the loan by the end of the twelfth year. Despite improvements in the reinvestment zone since 1989, the total appraised value of all taxable real property in the reinvestment zone had decreased to $32,577,087.00 as of January 1, 1993. Because the total appraised value of all taxable real property in the reinvestment zone has decreased since 1988, the captured appraised value of the property in the reinvestment zone is a negative number. You suggest that this situation is anticipated to continue and that it is very unlikely that the reinvestment zone will generate any revenues for the foreseeable future.

It is not apparent from your letter or the exhibits appended thereto that the city has issued any tax increment bonds or notes to finance the reinvestment zone. We assume that there are no claims against the tax increment fund other than the city's loan to the reinvestment zone. We do not address the termination of a reinvestment zone in circumstances other than those at issue here.

In light of this factual background, you ask, "If the City terminates the Zone by City ordinance pursuant to [section] 311.017(a) of the Act, can the City then create a new

---

[1]One court has explained the theory of the financing of a reinvestment zone as follows:

> Under this scheme, the existing tax revenues of each "taxing unit" are frozen; the tax increment financing bonds are sold; the improvements are constructed; the "blighted area" is revitalized; property values soar and ad valorem tax revenues increase. The increased tax revenues over and above the tax increment base are then used to retire the tax increment financing obligations.

*El Paso Community College Dist. v. City of El Paso*, 698 S.W.2d 248, 250 (Tex. App.--Austin 1985), *rev'd on other grounds*, 729 S.W.2d 296 (Tex. 1987).

[] reinvestment zone with geographic boundaries identical to those of the original Zone for the purpose of setting a new tax increment base pursuant to [section] 311.012(c) of the Act?" We believe the act permits these steps. First, section 311.017(a) of the act clearly permits a municipality to establish the termination date of a reinvestment zone in an ordinance adopted subsequent to the ordinance creating the zone.[2] Second, the act sets forth various criteria for a reinvestment zone, *see id.* § 311.005, as well as restrictions on the composition of a reinvestment zone, *see id.* § 311.006. These criteria and restrictions do not preclude the creation of a reinvestment zone in a geographic area that formerly comprised a reinvestment zone. We believe that if a geographic area satisfies these criteria and restrictions, it is eligible to be designated as a reinvestment zone, regardless of its past history. Of course, if the existing reinvestment zone is terminated and a new one created, the city must adhere to the procedures for creating a reinvestment zone in creating the new zone, just as it would in creating any other zone. *See, e.g., id.* §§ 311.003 - .004.

Next you ask if the city's loan to the first reinvestment zone may be treated as a "project cost" of the second reinvestment zone pursuant to section 311.002(1) of the act, or if the loan could be assumed by the second reinvestment zone. Section 311.002(1) sets forth a lengthy and detailed definition of the term "project costs":

> (1) "Project costs" means the expenditures made or estimated to be made and monetary obligations incurred or estimated to be incurred by the municipality establishing a reinvestment zone that are listed in the project plan as costs of public works or public improvements in the zone, plus other costs incidental to those expenditures and obligations. "Project costs" include:

>> (A) capital costs, including the actual costs of the acquisition and construction of public works, public improvements, new buildings, structures, and fixtures; the actual costs of the acquisition, demolition, alteration, remodeling, repair, or reconstruction of existing buildings, structures and fixtures; and the actual costs of the acquisition of land and equipment and the clearing and grading of land;

>> (B) financing costs, including all interest paid to holders of evidences of indebtedness or other obligations issued to pay for project costs and any premium paid over the principal amount of the obligations because of the redemption of the obligations before maturity;

>> (C) real property assembly costs;

---

[2]If a municipality has issued bonds on behalf of the reinvestment zone, section 311.017(b) allows the municipality to discharge the tax increment pledged to pay any bonds and interest on the bonds and to terminate the reinvestment zone by establishing a fund to pay the bonds and interest. We assume that the city has not issued any bonds on behalf of the reinvestment zone at issue.

(D) professional service costs, including those incurred for architectural, planning, engineering, and legal advice and services;

(E) imputed administrative costs, including reasonable charges for the time spent by employees of the municipality in connection with the implementation of a project plan;

(F) relocation costs;

(G) organizational costs including the costs of conducting environmental impact studies or other studies, the cost of publicizing the creation of the zone, and the cost of implementing the project plan for the zone;

(H) interest before and during construction and for one year after completion of construction, whether or not capitalized;

(I) the cost of operating the reinvestment zone and project facilities;

(J) the amount of any contributions made by the municipality from general revenue for the implementation of the project plan; and

(K) payments made at the discretion of the governing body of the municipality that the municipality finds necessary or convenient to the creation of the zone or to the implementation of the project plans for the zone.

Clearly, project costs are limited to "the expenditures made or estimated to be made and monetary obligations incurred or estimated to be incurred by the municipality" in establishing a particular reinvestment zone, and do not include expenditures made by the municipality in the past in establishing a now defunct reinvestment zone. We do not believe that the pre-existing debt of a defunct reinvestment zone falls within the statutory definition of the term "project costs." Furthermore, we see nothing in the act that would authorize a reinvestment zone to assume the debt of a defunct reinvestment zone. In enacting the reinvestment zone provisions, the legislature carefully delineated the authority of municipalities with respect to reinvestment zones as well as the powers of the governing boards of reinvestment zones. *See id.* §§ 311.008 (powers of municipality), 311.010 (powers of board of directors), 311.011 (project and financing plans). None of these provisions authorize a reinvestment zone to assume a pre-existing debt of another entity.

Finally, you ask whether there is any mechanism by which the tax increment base can be adjusted to account for the severe decrease in the total appraised value of the real property in the reinvestment zone. Section 311.012(c) expressly provides that "[t]he tax

increment base of a taxing unit is the total appraised value of all real property taxable by the unit and located in a reinvestment zone for the year in which the zone was designated." *See Lampson v. City of Beaumont*, 687 S.W.2d 788, 789 (Tex. App.--Beaumont 1985, no writ) (holding that the statutory predecessor to section 311.012(c) required the tax increment base to be determined on the basis of the total appraised value of all real property in the reinvestment zone in the year in which the zone was designated rather than the year in which the zone took effect). There is no provision in the act for changing the tax increment base, and we are not aware of any other statute which would permit the city to do so.

## S U M M A R Y

A municipality that terminates a reinvestment zone by ordinance pursuant to section 311.017(a) of the Tax Code may then create a new reinvestment zone with geographic boundaries identical to those of the original zone. A municipality's loan to the first reinvestment zone may not be treated as a "project cost" of the second reinvestment zone pursuant to section 311.002(1) of the act, nor may such a loan be assumed by the second reinvestment zone. There is no mechanism for adjusting the tax increment base of a reinvestment zone to account for a severe decrease in the total appraised value of the real property in the reinvestment zone. *See* Tax Code § 311.012(c).

Yours very truly,

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by Mary R. Crouter
Assistant Attorney General